IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| In re:<br><br>JADE PRESENTS, LLC<br><br>Debtor. | Case No. 26-30438<br>(Chapter 11) |
| In re:<br><br>TICKETS300, LLC<br><br>Debtor | Case No. 26-30439<br>(Chapter 11)<br><br>(Jointly Administered) |
| JADE PRESENTS, LLC<br><br>Plaintiff,<br><br>v.<br><br>UNIQUE FUNDING SOLUTIONS LLC a/k/a BLUEBRIDGE FUNDING a/k/a SCG FUNDING a/k/a VITAL CAP FUNDING a/k/a TVT a/k/a FUNDKITE<br><br>Defendant. | Adv. Case No. 26-07019 |

# COMPLAINT

Comes now Jade Presents, LLC ("Jade Presents" or the "Debtor"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 7003 and Federal Rule of Civil Procedure 3, and as and for its complaint against Unique Funding Solutions LLC a/k/a Bluebridge Funding a/k/a SCG Funding a/k/a Vital Cap Funding a/k/a TVT a/k/a Fundkite ("UFS" or the "Defendant") states as follows:

**Introduction**

1. In the year immediately preceding the filing of a petition for bankruptcy relief, the Debtor paid at least $216,000.00 (and potentially as much as $283,884.40) to the Defendant, pursuant to a merchant cash advance ("MCA") transaction.

2. The MCA transaction is titularly a sale of future receivables, in exchange for upfront cash.

3. If the MCA transaction is, in fact, an actual sale of future receivables, the transaction (and every payment made thereupon) is a constructively fraudulent conveyance, being a sale made at the time the Debtor was insolvent, with Jade receiving well less than reasonably equivalent value for the receivables putatively sold.

4. If the MCA transaction is not, in fact, an actual sale of future receivables, the transaction is a poorly-disguised usurious loan pursuant to Florida law (which governs the transaction, per the Defendant's own agreement).

5. Regardless of whether made pursuant to a sales agreement or loan, each payment made to the Defendant, by the Debtor, constitutes a fraudulent conveyance and is thusly avoidable under both title 11 of the United States Code (the "Bankruptcy Code") and North Dakota law.

6. The Debtor accordingly now brings suit to avoid at least $216,000.00 in fraudulent conveyances, seeking a money judgment as against the Defendant for all monies paid pursuant to the aforesaid agreement.

**Parties**

7. The Debtor is a limited liability company, formed pursuant to the laws of the State of North Dakota on or about January 11, 2006, that filed a petition for chapter 11 relief, pursuant to section 301 of the Bankruptcy Code, on or about June 6, 2026.

8. UFS is a limited liability company, formed pursuant to the laws of the State of New York on or about March 30, 2016, carrying on the business of entering into MCA agreements.

9. UFS also trades as—or has historically traded as—Bluebridge Funding, SCG Funding, Vital Cap Funding, Velocity, TVT, Fundkite, Business Boost Capital, and Brothers Funding.

**Jurisdiction and Venue**

10. This Honorable Court enjoys jurisdiction over the instant proceeding pursuant to the allowances of section 1334 of title 28 of the United States Code, insofar as the causes of action set forth herein arise under the Bankruptcy Code.

11. This Honorable Court further enjoys jurisdiction over the instant proceeding pursuant to the allowances of section 1332 of title 28 of the United States Code, insofar as this case is between citizens of different states and the amount in controversy exceeds Seventy Five Thousand Dollars and No Cents ($75,000.00).

12. Venue is properly laid in this Honorable Court pursuant to the allowances of section 1409 of title 28 of the United States Code insofar as the chapter 11 case of the Debtor is pending in this Honorable Court.

13. To whatever extent this case may be brought in the United States District Court for the District of North Dakota, on account of there existing diversity jurisdiction *sub judice*, this case is nonetheless properly referred to this Honorable Court insofar as the case relates to an active bankruptcy proceeding.

**General Allegations: MCA Industry**

14. This case concerns the MCA industry, of which UFS is a notable—albeit not major—participant.

15. An MCA transaction is ordinarily a disguised form of predatory loan, whereby an entity like UFS tenders funds to a small business and, in return, receives an aggressive repayment commitment that often exceeds 60% per annum.

16. The fiction of an MCA transaction is that the arrangement is not a loan but, rather, a sale of "future receivables," with a merchant receiving cash in exchange for parting with a percentage of future revenues.

17. Unlike a traditional factoring arrangement, however, the merchant in an MCA transaction is not selling any cognizable, extant receivable or pool of receivables; in an MCA transaction, the merchant is selling a portion of *all* future receivables, a wholly inchoate and legally inalienable asset.

18. As at least one court has observed, the entire construct of an MCA transaction ". . . is both a metaphysical and legal impossibility. . . . A transfer of future rights to payment—that is, rights that as yet do not exist—cannot occur unless and until the rights to payment arise." *M Design Vill. v. Versant Funding LLC (In re M Design Vill.)*, 2025 WL 2088887, 2025 Bankr. LEXIS 1778, at *19 (Bankr. D.N.J. July 24, 2025).

19. Also unlike a traditional factoring arrangement, an MCA transaction ordinarily contains provisions that ensure the merchant is, in reality, repaying a loan, with the terms of collection having little-to-nothing to do with the merchant's actual receivables.

20. At bottom, MCA transactions are structured to maximize the chances of MCA entities being repaid their monies—with interest—regardless of the future performance of a given merchant, and key to such is a combination of (i) hair-trigger default provisions that effectively accelerate debt or an owner's guaranty of repayment; (ii) overly-complex reconciliation provisions that make changing payment sums prohibitively difficult and that never allow for the gross

collectable sum to be altered in any event; and (iii) pressure tactics from employees of MCA entities.

21. UFS operates in the burgeoning national MCA industry.

**General Allegations: Parties' Relationship**

22. The Debtor and the Defendant entered into an agreement (the "Purchase Agreement"), on or about July 3, 2025, pursuant to which the Debtor putatively sold a percentage of future, undefined receivables to the Defendant in exchange for cash.

23. Specifically, the Purchase Agreement provides for the sale of $216,000.00 in future receivables, in exchange for a payment from UFS of $150,000.00 (less $4,500.00 in miscellaneous—and facially suspect—fees), with weekly payments of $8,307.70 to be made by the Debtor. This is a 44% markup that annualizes to an 85.79% return for UFS based on the repayment timetable (with the annualized return being higher than the markup since repayment is scheduled to occur, in full, in less than one year).

24. The Purchase Agreement is governed by the laws of the State of Florida.

25. In total, the Defendant disbursed at least $145,500.00 to the Debtor.

26. The Debtor, in turn, remitted at least $216,000.00 (and possibly as much as $283,884.40, though markup and interest calculations above are premised upon the $216,000.00 figure) to the Defendant during a span of approximately six and a half months.

**Count I: Fraudulent Conveyance**
**(11 U.S.C. § 548)**

27. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

28. The Debtor had financial liabilities that exceeded the Debtor's assets, from July 3, 2025 forward, and was thusly insolvent at the time of entering into the agreement with the Defendant.

29. The Debtor was without the ability to pay its debts, as they came due, at all times from July 3, 2025 forward.

30. Assuming, *arguendo*, the Purchase Agreement is a *bona fide* sales agreement, the sale of future receivables was made for markedly less than reasonably equivalent value.

31. If the Purchase Agreement is a mischaracterized loan, the Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

32. Between July 3, 2025 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $216,000.00 pursuant to the Purchase Agreement.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not expressly enumerated herein but entered into during the application statutory limitations period), as well as all payments made thereunder, pursuant to the allowances of section 548(a)(1)(B) of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all monies paid to the Defendant pursuant to any Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count II: Fraudulent Conveyance**
**(11 U.S.C. § 544; N.D. Cent. Code § 13-02.1-04)**

33. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

34. The Purchase Agreement caused the Debtor to have remaining assets that were unreasonably small in relation to the obligations incurred thereunder, with the cash furnished through the agreement being insufficient to retire the obligations simultaneously incurred therewith.

35. The Debtor was without the ability to pay its debts, as they came due, at all times from July 3, 2025 forward.

36. The Purchase Agreement denoted the incursion of a debt beyond the Debtor's ability to pay, with payments on the Purchase Agreement necessarily coming at the expense of the timely retirement of the Debtor's other monetary obligations.

37. Assuming, *arguendo*, the Purchase Agreement is a *bona fide* sales agreement, the sale of future receivables was made for markedly less than reasonably equivalent value.

38. If the Purchase Agreement is a mischaracterized loan, the Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

39. Between July 3, 2025 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $216,000.00 pursuant to the Purchase Agreement.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not expressly enumerated herein but entered into during the application statutory limitations period), as well as all payments made thereunder, pursuant to the allowances of section 544 of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all monies paid to

the Defendant pursuant to any Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count III: Fraudulent Conveyance**
**(11 U.S.C. § 544; N.D. Cent. Code § 13-02.1-05)**

40. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

41. The Debtor had financial liabilities that exceeded the Debtor's assets, from July 3, 2025 forward, and was thusly insolvent at the time of entering into the agreement with the Defendant.

42. The Debtor was without the ability to pay its debts, as they came due, at all times from July 3, 2025 forward.

43. Assuming, *arguendo*, the Purchase Agreement is a *bona fide* sales agreement, the sale of future receivables was made for markedly less than reasonably equivalent value.

44. If the Purchase Agreement is a mischaracterized loan, the Purchase Agreement is violative of both of the criminal *and* civil usury laws of the State of New York and thusly made for less than reasonably equivalent value.

45. Between July 3, 2025 and June 6, 2026, the Debtor paid the Defendant a sum of not less than $216,000.00 pursuant to the Purchase Agreement.

46. The Debtor was justly indebted to, *inter alia*, Horizon Investments, LLC, pursuant to the terms of a $525,000.00 promissory note and related loan documents (including a subsequent forbearance agreement) from at least December 20, 2020 and at all times thereafter.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) avoid all Purchase Agreements between the Debtor and the Defendant (including any Purchase Agreements not expressly enumerated herein but entered into during the application statutory limitations period),

as well as all payments made thereunder, pursuant to the allowances of section 544 of title 11 of the United States Code; (ii) enter judgment in favor of the Debtor, and against the Defendant, pursuant to section 550 of title 11 of the United States Code, in a sum equal to all monies paid to the Defendant pursuant to any Purchase Agreements; and (iii) afford such other and further relief as may be just and proper.

**Count IV: Violation of Securities and Exchange Commission Rule 10b-5**

47. The Debtor repeats and realleges each and every foregoing paragraph, as though fully set forth herein.

48. UFS drafted the Purchase Agreement.

49. UFS presented the Purchase Agreement to the Debtor, for execution.

50. The Debtor did not edit the Purchase Agreement.

51. The Purchase Agreement contains various material misrepresentations and omissions.

52. Specifically, the Purchase Agreement provides, *inter alia*, "[e]ach Merchant and UFS agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from UFS to any Merchant," when the transaction occasioned by the Purchase Agreement is, in actuality, a loan.

53. It was the intent of UFS that the at-issue transaction be, materially, a loan, with UFS being in the business of lending monies and disguising such loans as future receivables purchases.

54. Specifically, despite being a loan, the Purchase Agreement does not set forth an interest rate and thereby omits a material fact, despite providing, *inter alia*, "[a]lthough certain

jurisdictions may require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate."

55. UFS made these misrepresentations and omissions with scienter, as UFS is motivated to deceive merchants (like the Debtor) and their principals.

56. Specifically, UFS would not garner as much business if UFS disclosed transactions to actually be loans, because presentation of the associated interest rates would cause potential counterparties to decline to enter into agreement on such conscious-shocking terms.

57. Specifically, the Debtor would not have agreed to borrow money at the rate of 85.79% per annum.

58. It is further evident UFS made these misrepresentations and omissions with scienter insofar as the inclusion of these misrepresentations—and the exclusion of these omitted material terms—from UFS's standardized agreement permits UFS to conduct business in states with commercial usury limits, by allowing UFS to feign to be a purchaser and not a lender.

59. The Debtor has suffered an economic loss on account of the Purchase Agreement by paying to UFS monies of not less than $216,000.00.

60. A loan is a security within the definitional ambit of section 78c(a)(10) of title 15 of the United States Code.

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) enter judgment against UFS, and in favor of the Debtor, in a sum equal to all monies paid to the Defendant pursuant to any Purchase Agreements; and (ii) afford such other and further relief as may be just and proper.

*[Signature on Following Page]*

Respectfully Submitted,

Dated: August 24, 2026

By: /s/ Maurice B. VerStandig

Maurice B. VerStandig, Esq.
The Dakota Bankruptcy Firm
1630 1st Avenue N
Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
*Counsel for the Debtor*